**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
              :

TAREK    HOLDINGS,   LLC   and   TAREK    :
ABOUSALEM,         :     Case No.
         :

         Plaintiffs,    :    **VERIFIED COMPLAINT FOR**
         :    **DECLARATORY JUDGMENT**
    vs.        :    **AND INJUNCTIVE RELIEF**
         :

GREG SHOCKLEY and JAMES SHOCKLEY,    :
         :

         Defendants.    :
         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiffs Tarek Holdings, LLC ("Plaintiff Tarek Holdings") and Tarek Abousalem ("Plaintiff Abousalem") (collectively, "Plaintiffs"), by and through their counsel, Blick Law LLC, by way of Verified Complaint for Declaratory Judgment and Injunctive Relief against Defendants Greg Shockley and James Shockley (collectively, "Defendants"), state as follows:

## PRELIMINARY STATEMENT

       This case involves Defendants' fraudulent misappropriation, intentional devaluation, and diversion of corporate assets, opportunities, and income for the purpose of depriving Plaintiffs of profits and commissions to which they are legally entitled.

       Plaintiff Abousalem is an experienced digital marketing consultant and software developer. Defendants approached Plaintiff Abousalem in early Spring of 2020 requesting that he help Defendants develop a website dedicated to creating and sharing cooking content. After meeting with Defendants, Plaintiff Abousalem came up with the idea of not only creating the contemplated website, but creating a new social media platform where both professional chefs and users could interface, share user generated content, and watch and participate in JOMBY exclusive content.

Defendants loved the idea and created Just One More Bite Media Group, LLC ("JOMBY") with Plaintiff Abousalem on May 26, 2020.

In doing so, the parties executed an Operating Agreement of same date (the "Agreement"). The Agreement provides that Plaintiff Abousalem's company, Plaintiff Tarek Holdings is a member and one-third owner of JOMBY along with Defendants. Each member was required to make an initial capital contribution of $50,000, with Tarek Holdings' contribution provided in the form of services by Plaintiff Abousalem. Under the Agreement, Plaintiff Abousalem has an unconditional veto over any decision to transfer all or substantially all of JOMBY's assets, liquidate, dissolve, or merge JOMBY with another entity, approve transactions involving potential partner conflicts, change the nature of JOMBY's business, or pay any compensation to the JOMBY's members.

Plaintiff Abousalem developed JOMBY's state-of-the-art website and the initial design, prototype, and user experience interface for the JOMBY mobile app. The parties also constructed a studio kitchen where Defendant Greg Shockley, a professional chef, the owner and founder of Sage Catering, LLC, and an on-air representative for QVC representing brands like Le Creuset, Vitamix, and Traeger Grills, would film JOMBY content while charging sponsors to use their products. Plaintiff Abousalem completed and delivered the JOMBY website but the parties quickly realized that more capital needed to be raised from investors in order to properly develop a custom JOMBY mobile app with the desired business features to make it stand out in the market. Though each of the members agreed to assist in raising capital, the Shockley Defendants not only failed do so but Defendant James Shockley failed to make the initial $50,000 monetary capital contribution required under the Agreement.

The Defendants thereafter began diverting JOMBY's client accounts, business opportunities, assets, revenues, and profits to other companies owned and/or controlled by Defendants. Defendant Greg Shockley secretly developed those opportunities using JOMBY infrastructure and connections to benefit himself while failing to make any mention of or otherwise promote JOMBY in his appearances, videos, and social media posts, including without limitation appearing from the JOMBY studio kitchen on QVC. JOMBY has seen no revenue from this work. Defendants have usurped JOMBY's approximately 400,000 followers across social media accounts for their own financial gain, diverting any revenue from JOMBY productions to another business in which Mr. Abousalem has no stake. Defendants have also suspended JOMBY's YouTube channel despite Plaintiffs cease and desist letter instructing Defendants not to. Defendants have thus breached the terms of the Operating Agreement, acted in bad faith, diluted the JOMBY brand, and rendered Tarek Holdings', and therefore Mr. Abousalem's stake in JOMBY essentially worthless.

Accordingly, Plaintiffs seek judgment in their favor and against the Defendants for the loss of profits, loss of good will, loss of business value, loss of assets, loss of time and materials, and loss of business opportunities associated with the Defendants' usurping, misappropriating, diverting, and/or wasting JOMBY assets, client accounts, business opportunities, revenue, and profits, together with interest thereon, along with attorney's fees, costs of this action and such other further relief as the Court deems equitable and just.

Plaintiffs further seek an order directing the enforcement and specific performance of the Agreement;

a.  Directing the Defendants to immediately return all previously transferred assets, client accounts, business opportunities, revenues, and profits to JOMBY, including without limitation JOMBY's intellectual property;

b.  Directing that the Defendants immediately reinstate JOMBY's YouTube channel and account;

c.  Directing that the Defendants immediately transfer Defendants' membership and ownership interests in JOMBY to Plaintiffs;

b.  Immediately enjoining the Defendants, or any person or entity acting on their behalf, from misappropriating, diverting, transferring, funneling, disposing or otherwise alienating, encumbering, or diminishing the assets, client accounts, business opportunities, revenues, and profits of JOMBY, directly or indirectly, other than transactions for fair consideration in the ordinary course of business;

c.  Immediately enjoining the Defendants, or any person or entity acting on their behalf, from diverting, transferring, funneling, disposing or otherwise alienating, encumbering, or diminishing any assets, client accounts, business opportunities, revenues, or profits received, acquired, or otherwise obtained from the JOMBY;

d.  Immediately voiding the transfer of JOMBY's assets, client accounts, business opportunities, revenues, and profits to any other person or entity, directly and indirectly, other than transactions for fair consideration in the ordinary course of business; and

e.  Directing that the Defendants immediately take all other actions that the Court deems equitable and just.

## PARTIES

1.      Plaintiff Tarek Holdings, LLC is a limited liability company organized under the laws of the State of Delaware and maintains a principal place of business at 65 Orris Avenue, Piscataway, New Jersey 08854.

2.      Plaintiff Tarek Abousalem is an individual residing at 65 Orris Avenue, Piscataway, New Jersey 08854 and is a member of Plaintiff Tarek Holdings, LLC and co-founder of non-party JOMBY.

3.      Defendant Greg Shockley is an individual residing at 9 Wellfleet Lane, Glen Mills, Pennsylvania 19342 and is a member of non-party JOMBY.

4.      Defendant James Shockley is an individual residing at 555 South Goddard Boulevard, King of Prussia, Pennsylvania 19406 and is a member of non-party JOMBY.

## JURISDICTION & VENUE

5.      This Court possesses subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because Plaintiffs and all Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)-(c) because a substantial portion of the events giving rise to Plaintiffs' claims occurred in this district and one or more parties reside, maintain a registered office, or conducts business in this district.

## GOVERNING LAW

7.      The governing law to be applied in this dispute is that of the Commonwealth of Pennsylvania as the Plaintiffs and Defendants mutually agreed that any disputes arising out of the JOMBY Operating Agreement shall be settled in accordance with the law of the Commonwealth of Pennsylvania.

## STATEMENT OF FACTS

8.     Plaintiff Abousalem is a skilled digital marketing consultant and software developer.

9.     In the Spring of 2020, Defendant James Shockley contacted Plaintiff Abousalem in New Jersey and asked if he would speak with his father, Defendant Greg Shockley about developing a website dedicated to creating and sharing cooking content and videos.

10.    Defendant Greg Shockley is a professional chef, the owner and founder of non-party Sage Catering, LLC, and an on-air representative for QVC representing brand like Le Creuset, Vitamix, and Traeger Grills.

11.    Plaintiff Abousalem agreed and spoke with Defendant Greg Shockley soon after.

12.    Plaintiff Abousalem was in New Jersey when he spoke with Defendant Greg Shockley.

13.    After speaking with Defendant Greg Shockley, Plaintiff Abousalem came up with the idea to not only develop a cooking website dedicated to cooking content and videos, but to develop a full-scale social media platform and mobile app where both professional chefs and users could interface, upload user generated content, and consume platform generated and exclusive content.

14.    Defendants loved the idea and requested that Plaintiff Abousalem partner with them to develop the website, social media platform, and mobile app.

15.    Defendants represented that while Mr. Abousalem would develop the website, social media platform, and mobile app, Defendant Greg Shockley would create platform exclusive content and attract celebrity chefs, and that all members would solicit clients and investors.

16.     Plaintiff Abousalem was in New Jersey when Defendants made all or substantially all of the aforesaid representations to him.

17.     Based upon Defendants' representations, Plaintiff Abousalem was induced into forming a new entity with Defendants called Just One More Bite Media Group, LLC ("JOMBY").

18.     The parties executed the JOMBY operating agreement (the "Agreement") on May 26, 2020. See Exhibit A, the Agreement.

19.     Plaintiff Abousalem negotiated, reviewed, and executed the Agreement while located in New Jersey.

20.     Pursuant to the Agreement, Defendant Greg Shockley, Defendant James Shockley, and Plaintiff Abousalem's company, Tarek Holdings, were members of JOMBY with respective ownership stakes of 34 percent, 33 percent, and 33 percent.

21.     The members were each to contribute an initial capital contribution of $50,000, with Tarek Holdings' contribution to be in the form of services provided by Plaintiff Abousalem.

22.     The parties additionally agreed that Defendants would compensate Plaintiffs for services provided in excess of the initial $50,000 capital contribution required under the Agreement.

23.     Section 2.3 of the Agreement provides:

*Purposes of the Company.* The Company's primary business shall be creation of an app and website where users can post and view recipes and other content related to cooking, and download and/or purchase recipes and other cooking-related items (the "Business"). Notwithstanding the foregoing, the Company may engage in any lawful business, purposes or activities permitted by the Act or the laws of any jurisdiction in which the Company may do business, and the Company shall have the authority to do all this necessary, convenient or incidental to accomplish its purposes and operate its businesses as described herein.

See id. at § 2.3.

24.     Section 3.1 of the Agreement provides:

*Units.* Interests in the Company are represented by units ("Units"), with each Unit representing a fractional part of the Interests of all Members (or assignees, as the case may be) equal to the quotient of one divided by the total number of Units outstanding at any time, except as otherwise provided herein. Units may be expressed in whole or in fractions. Each Member shall initially have the Units set forth on Schedule A hereto.

See id. at § 3.1.

25.     Section 3.2 of the Agreement provides in pertinent part:

*Initial Members and Initial Capital Contributions.* The initial Members of the Company are listed on Schedule A hereto, each of which has executed this Agreement as of the date hereof and is hereby admitted to the Company as a Member. In consideration for capital contributions provided or to be provided to the Company, the Members have been credited with capital contributions and Interests specified on Schedule A hereto.

*       *       *

See id. at § 3.2.

26.     Schedule A to the Agreement provides:

SCHEDULE A

INITIAL CAPITAL CONTRIBUTIONS, UNITS AND INTERESTS

Just One More Bite Media Group, LLC

| Name | Capital Contribution | Units | Interest |
|------|---------------------|-------|----------|
| Greg Shockley | $50,000.00 | 340 | 34% |
| James Shockley | $50,000.00 | 330 | 33% |
| Tarek Holdings, LLC | $50,000.00* | 330 | 33% |

* Contribution to be made in the form of services.

See id. at Schedule A.

27.     The Agreement contains Section 4.6 which provides in pertinent part:

Extraordinary Decisions. Notwithstanding the foregoing, the unanimous consent of the Members shall be required in order to:

(a) transfer all or substantially all of the Company's assets;

*      *      *

(c) dissolve, liquidate or otherwise wind up the business of the Company;

(d) permit the merger or consolidation of the Company with another person;

*      *      *

(g) approve a transaction involving an actual or potential conflict of interest between any Member and the Company;

*      *      *

(i) change the nature of the Company's business;

*      *      *

(l) pay any compensation or salary to the Members in connection with their performance of services for the Company; or

*      *      *

28. Section 9.1 of the Agreement provides:

a. *Standard of Care.* A Member will not be liable to the Company or any Member for an act or omission done in good faith to promote the Company's best interests, unless the act or omission constitutes gross negligence, intentional misconduct or a knowing violation of law. A member may rely on the Company's records maintained in good faith and on information, reports or statements received from any person pertaining to matter such Member reasonably believes to be within the person's expertise or competence.

b. *No Competing Activities.* A Member may not participate in any business or activity which competes with the Company directly or indirectly, without the unanimous consent of the other Members. The Member requesting to participate in a competing activity shall not vote on the matter. A competing activity shall be any activity that engages in any aspect of the Business or any activity that is substantially similar to the Business. The Members agree that catering and event planning shall not be deemed activities that are substantially similar to the Business.

29.     Section 9.2 of the Agreement provides:

*Confidentiality.* Each Member acknowledges that (a) during such person's association with the Company, and in the course of that association, such Member will have access to Confidential Information and Trade Secrets of the Company, (b) the Confidential Information and Trade Secrets are the property of the Company, and (c) public disclosure of the Confidential Information or the Trade Secrets could have an adverse effect on the Company and its business. Both during and after such Member's association with the Company, such member will not disclose to anyone outside the Company, or use for any purpose other than for the exclusive benefit of the Company, any Confidential Information or Trade Secrets. Further, such Member will not remove from the Company's premises (except to the extent such removal is essential to the performance of such Member's duties at home or while traveling or except as otherwise specifically authorized by the Company) Confidential Materials. When a Member's association with the Company is terminated or upon the earlier request of the Company, such Member will return to the Company all of the Confidential materials in such Member's possession or subject to such Member's control and such Member will not retain any copies, abstracts, sketches, data bases, disks or other physical embodiment of any of the Confidential Materials. The provisions of this Section 9.2 shall survive the termination of this Agreement, the Dissociation of any Member and any other event that terminates any obligations of any Member under this Agreement.

See id. at § 9.2.

30.     Section 10.7 of the Agreement provides:

*Choice of Law.* This Agreement and all matters relating to the Company shall be governed and construed in accordance with the law of the Commonwealth of Pennsylvania.

See id. at § 10.7.

31.     Lastly, Schedule B of the Agreement entitled Anticipated Roles of Members

provides:

**Tarek Abousalem (Tarek Holdings,LLC) – Co-Founder & CDO (Chief Digital Officer)**

*            *            *

* Responsible for implementing technology solutions (including but not limited to website, mobile app, etc.) - Tarek has final say on technology & marketing decisions.

See id. at Schedule B.

32.     Plaintiffs designed, constructed, and delivered the JOMBY website.

33.     The JOMBY website is a state-of-the-art user interface complete with celebrity videos, chef profiles, recipes, blogs, search functions, and links to social media channels.

34.     Plaintiffs developed the initial design, user experience, and prototype for the JOMBY mobile app.

35.     Plaintiffs also provided other extensive services and work to Defendants and JOMBY, including without limitation, scoping out the various technologies and marketing components of the business, defining the business model, and developing revenue streams and an investor pitch technique.

36.     Plaintiffs performed all or substantially all of the aforesaid work and services within New Jersey.

37.     The value of the services and work that Plaintiffs provided to Defendants and JOMBY substantially exceeded the initial capital contribution required from Plaintiff Tarek Holdings under the Agreement.

38.     The parties ultimately determined that rather than the basic mobile app that they had initially contemplated, the JOMBY business model required a custom mobile app that would necessitate significantly more funding to develop as desired and ultimately designed.

39.     The parties agreed that all members would locate investors and secure the additional funding needed to properly develop the JOMBY custom mobile app.

40.     Defendants thereafter represented to Plaintiffs that they could not secure the funding needed to properly develop the JOMBY custom mobile app.

41.     Defendant James Shockley failed to make the initial $50,000 monetary capital contribution required under the Agreement.

42.     Defendants also failed to compensate Plaintiffs for a substantial portion of the services and work that Plaintiffs provided in excess of the initial capital contribution required under the Agreement.

43.     Defendants thereafter suspended all or substantially all of JOMBY's operations without Plaintiffs' knowledge, authorization, or approval.

44.     Defendants began diverting JOMBY business opportunities, revenues, and profits to another company or companies that Defendants own and/or control.

45.     Defendants also drained JOMBY's bank accounts and assets by spending them on items and services unrelated to JOMBY.

46.     By way of example, and without limitation, Defendant Greg Shockley had been recording cooking tutorials and producing online content for JOMBY under the JOMBY trade name. Defendant Greg Shockley proceeded to drop any reference to JOMBY from his productions, operating only under the name Greg Shockley and diverting any revenues or profits from said work away from JOMBY.

47.     By way of further example, and without limitation, Defendants continued using the studio kitchen and JOMBY's credit card to produce cooking tutorials and content while diverting any revenues and profits from said work and rental of the studio away from JOMBY.

48.     In doing so, Defendants used JOMBY's assets, intellectual property, and connections to develop and promote Greg Shockley's independent brand in direct competition with JOMBY.

49.     Defendants additionally wrongfully depleted JOMBY funds, revenues, and profits by spending JOMBY funds on materials, services, and labor that either was unrelated to JOMBY's business or unauthorized and/or objected to by Plaintiff Abousalem.

50.     Upon information and belief, Defendants remain actively engaged in a course of conduct aimed at usurping, misappropriating, diverting, and/or wasting JOMBY assets, client accounts, business opportunities, revenue, and profits.

51.     Upon information and belief, Defendants have engaged in and continue this course of conduct in order to wrongfully enrich themselves at the expense of JOMBY and to damage, harm, and retaliate against Plaintiffs.

52.     Indeed, Defendants most recently deleted and/or suspended JOMBY's YouTube channel despite Plaintiffs' cease and desist letter directing that Defendant preserve all of JOMBY's websites, domain names, and social media accounts.

53.     Plaintiffs have demanded that Defendants immediately cease and desist from their unethical, improper, bad faith, and illegal conduct without success.

54.     As a direct and proximate result of the actions and/or inactions of Defendants, Plaintiffs have and will continue to suffer significant and substantial damages, which have and will be suffered within the State of New Jersey.

55.     Accordingly, Plaintiffs have been left with no choice but to institute this action for summary and injunctive relief.

## COUNT ONE
### (*Breach of Fiduciary Duty – as to All Defendants*)

56.     Plaintiffs repeat and reallege the previous allegations as if set forth more fully herein.

57.     The Defendants are members and co-founders of JOMBY

58.     As members and co-founders of JOMBY, the Defendants owed and continue to owe fiduciary duties to their fellow member, Plaintiff Tarek Holdings and co-founder, Plaintiff Abousalem.

59.     Defendants breached their fiduciary duties to Plaintiffs by negligently and/or intentionally failing to act in good faith and solely for the benefit of JOMBY in all matters relating to their positions as members and co-founders of JOMBY.

60.     By way of example, and without limitation, Defendants breached their fiduciary duties to Plaintiffs by misappropriating, usurping, diverting, and depleting the assets, client accounts, business opportunities, revenues, and profits of JOMBY.

61.     As a direct and proximate result of Defendants' breach, Plaintiffs have and will continue to sustain significant and substantial damages.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

### COUNT TWO
#### (*Fraud – as to All Defendants*)

62.     Plaintiffs repeat and reallege the previous allegations as if set forth more fully herein.

63.     Defendants misrepresented to Plaintiffs that if they formed JOMBY with Defendants and invested therein, Defendants would devote their money, time, effort, and loyalty into establishing, creating, and growing the JOMBY business, including a website, custom mobile

app, social media platforms, JOMBY created content, and studio kitchen, with all revenues and profits to be maintained, used and/or distributed in accordance with the terms of the Agreement.

64.     Defendants made the aforesaid misrepresentations with knowledge or belief of their falsity.

65.     Specifically, Defendants made the aforesaid misrepresentations with no intention to satisfy or otherwise abide therewith.

66.     Defendant made the aforesaid misrepresentations with the intention that Plaintiffs rely thereon to Plaintiffs' detriment.

67.     Plaintiffs reasonably relied upon Defendants' misrepresentations by, among other things, entering the Agreement, constructing the studio kitchen, and developing the website, the JOMBY YouTube channel, the initial prototype and design for the mobile app, and the JOMBY user experience.

68.     In so doing, Plaintiffs expended significant money, time, and effort to the benefit of the Defendant and detriment of Plaintiffs.

69.     As a direct and proximate result of Defendants' fraudulent misrepresentations and conduct aforesaid, Plaintiffs have and will continue to sustain significant and substantial damages.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

## COUNT THREE
### (*Breach of Contract – as to All Defendants*)

70.     Plaintiffs repeat and reallege the previous allegations as if set forth more fully herein.

71.     Plaintiffs and Defendants, through their words, actions, and/or course of performance, entered into the Agreement which is a binding contract.

72.     Plaintiffs have performed, and remain ready, willing, and able to continue performing, any and all of their obligations under the Agreement.

73.     Defendants have breached their express and implied contractual obligations to Plaintiffs under the Agreement by failing to perform thereunder.

74.     By way of example, and without limitation, Defendants have breached their duties under the Agreement by misappropriating, diverting, usurping, and depleting JOMBY's assets, client accounts, business opportunities, revenues, and profits, competing with JOMBY, failing to make the requisite capital contributions, and unilaterally making decisions and taking action without Plaintiffs' requisite authorization and approval.

75.     As a direct and proximate result of Defendants' breach of the Agreement, Plaintiffs have and will continue to sustain significant and substantial damages.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

## COUNT FOUR
### (*Conversion – as to All Defendants*)

76.     Plaintiffs repeat and reallege the previous allegations as if set forth more fully herein.

77.     Plaintiffs purchased a 33 percent ownership stake in JOMBY over which they had right and title.

78.     Plaintiffs' ownership stake in JOMBY extended over the assets, client accounts, business opportunities, revenues, and profits of JOMBY.

79.     Defendants have and continue to wrongfully and without authorization exercise dominion and control over Plaintiffs' ownership stake in JOMBY and its assets, client accounts, business opportunities, revenues, and profits in denial or defiance of or adverse to Plaintiffs' title, use, or possessory rights.

80.     Defendants have and continue to wrongfully and without authority exercise dominion and control, as aforesaid, in a manner inconsistent with Plaintiffs' title, use, or possessory rights over its ownership stake in JOMBY and its assets, client accounts, business opportunities, revenues, and profits.

81.     Defendants have therefore unlawfully converted the property of Plaintiffs.

82.     As a direct and proximate result of Defendants' conduct aforesaid, Plaintiffs have and will continue to sustain significant and substantial damages.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-

judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

## COUNT FIVE
### (*Unjust Enrichment – as to All Defendants*)

83.     Plaintiffs repeat and reallege the previous allegations as if set forth more fully herein.

84.     Plaintiffs provided certain work, services, materials, business relationships, business contacts, business opportunities, financial contributions, revenues, and profits resulting in a substantial benefit to Defendants.

85.     Defendants have and continue to profit from Plaintiffs' contributions which Defendants have misappropriated, diverted, and usurped.

86.     Despite that benefit, Defendants have failed to compensate Plaintiffs commensurate with the monetary benefit conferred upon them.

87.     Defendants have misappropriated, diverted, and usurped Plaintiffs' contributions under such circumstances that Defendants knew that Plaintiffs expected to be compensated.

88.     Defendants have misappropriated, diverted, and usurped Plaintiffs' contributions under such circumstances that it would be inequitable for Defendants to retain the benefits of Plaintiffs' contributions without payment of value.

89.     As a result, Defendants have been unjustly enriched to the detriment of Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-

judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

## COUNT SIX
### (*Negligent Misrepresentation – as to All Defendants*)

90.     Plaintiffs reassert and reallege the previous allegations as if set forth more fully herein.

91.     Defendants owed and continue to owe a duty to Plaintiffs to provide accurate and correct representations and information, and to provide all of the relevant information and background concerning the creation, ownership, and operation of JOMBY, the use of JOMBY assets, business opportunities, capital, revenues, and profits, the financial health of JOMBY, and the nature and origin of JOMBY's assets, client accounts, business opportunities, revenues, and profits.

92.     The Defendants breached that duty by expressly and/or implicitly providing false information, or making material misrepresentations/omissions, upon which Plaintiffs reasonably relied to their detriment.

93.     The Defendants knew or should have known of the falsity of the misrepresentations and omissions when made.

94.     The Defendants failed to exercise reasonable care in providing the false information, or making the material misrepresentations/omissions, to Plaintiffs.

95.     Plaintiffs reasonably relied upon the false information, or material misrepresentations/omissions, to their pecuniary detriment.

96.     In making said misrepresentations and omissions, the Defendants intended to induce Plaintiffs to, amongst other things, agree to form JOMBY and invest significant money, services, time, and effort therein.

97.     As a direct and proximate result of that breach, Plaintiffs have and will continue to sustain significant and substantial damages.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

### COUNT SEVEN
#### (*Negligence – as to All Defendants*)

98.     Plaintiffs reassert and reallege the previous allegations as if set forth more fully herein.

99.     The Defendants owed and continue to owe a duty to Plaintiffs to exercise reasonable prudence in their dealings with Plaintiffs and in the conduct of JOMBY.

100.    The Defendants owed and continue to owe Plaintiffs an elevated duty of care given Plaintiffs status and special relationship as a member and/or co-founder of JOMBY.

101.    Defendants breached that duty by misappropriating, depleting, transferring, and otherwise reducing the value and number of JOMBY's assets, client accounts, business opportunities, revenue, and profits, and suspending or largely suspending JOMBY's business and operations, and otherwise acting against the best interest of JOMBY.

102.    The Defendants further breached that duty by advancing their own interests to the detriment of Plaintiffs, self-dealing, ignoring conflicts of interest, competing with JOMBY, and/or damaging JOMBY to further their personal vendetta against Plaintiffs.

103.    As a direct and proximate result of said breaches, Plaintiffs have and will continue to sustain significant and substantial damages.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

<u>**COUNT EIGHT**</u>
(*Piercing the Corporate Veil/Alter Ego Liability – as to All Defendants*)

104.    Plaintiffs reassert and reallege the previous allegations as if set forth more fully herein.

105.    The Defendants own 67 percent of JOMBY.

106.    Other than Plaintiffs, who are minority shareholders and/or co-founders, JOMBY has not other officers, directors, or corporate structure or procedures.

107.    The Defendants used and continue to use the corporate veil of JOMBY and their other entities as mere instrumentalities for their personal business conduits, as described herein.

108.    JOMBY and Defendants' other business entities were used by the Defendants as their alter egos.

109.    The Defendants disregarded corporate form and used JOMBY and their other entities to perpetrate the wrongdoing complained of herein.

110.    In doing so, the Defendants used JOMBY and their other entities to defraud Plaintiffs by inducing them to create, invest in, and work for JOMBY without any intention to honor the promises set forth in the Agreement and then misappropriate, divert, funnel, and

otherwise transfer JOMBY's assets, client accounts, business opportunities, revenues, and profits to themselves and/or other business entities that Defendants own and/or control.

111.    As a direct and proximate result of the conduct aforesaid, Plaintiffs have and will continue to sustain significant and substantial damages.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

### COUNT NINE
#### (*Conspiracy – as to All Defendants*)

112.    Plaintiffs reassert and reallege the previous allegations as if set forth more fully herein.

113.    Defendants acted in concert to fraudulently induce Plaintiffs to enter the Agreement, fraudulently transfer, divert, misappropriate, and/or deplete JOMBY's assets, business opportunities, revenues, and profits, and misrepresent and/or omit certain facts and information, and thereby commit the unlawful acts described herein.

114.    Defendants entered into an agreement to commit the aforementioned acts and to inflict damages to Plaintiffs.

115.    In doing so, the Defendants intended to accomplish an unlawful goal for the purpose of harming Plaintiffs.

116.    Defendants each are equally and vicariously liable for the damages proximately caused to Plaintiffs.

117.    As a direct and proximate result of the aforesaid conspiracy, Plaintiffs have and will continued to sustain significant and substantial damages.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

## COUNT TEN
### (*Declaratory Relief – as to All Defendants*)

118.    Plaintiffs reassert and reallege the previous allegations as if set forth more fully herein.

119.    This action presents an actual case or controversy between Plaintiffs and Defendants regarding the terms and enforcement of the Agreement.

120.    The Agreement provides Plaintiff Tarek Holdings, and Plaintiff Abousalem as its sole member, with a 33 percent ownership stake in JOMBY.

121.    The Agreement provides Plaintiffs with veto power over all decisions to change the nature of JOMBY's business, pay a salary to JOMBY's members, any transactions involving an actual or potential conflict of interest between a member and JOMBY, make distributions to JOMBY's members, or dissolve, wind down, or merge JOMBY.

122.    The Agreement provides Plaintiffs with final decision-making authority over all decisions regarding technology and marketing decisions.

123.    Defendants have acted in breach of the Agreement by, amongst other things, fraudulently transferring, diverting, misappropriating, and/or depleting JOMBY's assets, business

opportunities, revenues, and profits, and excluding Plaintiffs from the JOMBY decision making process, including the making of decisions over which Plaintiffs have unconditional veto power.

124.    As a result, Plaintiffs are entitled to a declaratory judgment finding that the Agreement is a valid and enforceable contract, that Defendants have breached the Agreement, and that Defendants remain bound to all duties under the Agreement, including without limitation their fiduciary duties to Plaintiffs.

WHEREFORE, Plaintiffs demand a judgment against all Defendants declaring that the Agreement is a valid and enforceable contract, that Defendants have breached the Agreement, and that Defendants remain bound to all duties under the Agreement, including without limitation their fiduciary duties to Plaintiffs, granting an award of compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

## COUNT ELEVEN
### (*Injunctive Relief – as to All Defendants*)

125.    Plaintiffs reassert and reallege the previous allegations as if set forth more fully herein.

126.    Plaintiffs now seek injunctive relief:

    a.   Directing the enforcement and specific performance of the Agreement;

    b.   Immediately enjoining the Defendants, or any person or entity acting on their behalf, from misappropriating, diverting, transferring, funneling, disposing or otherwise alienating, encumbering, or diminishing the assets, client accounts,

business opportunities, revenues, and profits of JOMBY, directly or indirectly, other than transactions for fair consideration in the ordinary course of business;

c.   Immediately enjoining Defendants, or any person or entity acting on their behalf, from diverting, transferring, funneling, disposing or otherwise alienating, encumbering, or diminishing any assets, client accounts, business opportunities, revenues, or profits received, acquired, or otherwise obtained from JOMBY;

d.   Immediately voiding the transfer of JOMBY's assets, client accounts, business opportunities, revenues, and profits to any other person or entity, directly and indirectly, other than transactions for fair consideration in the ordinary course of business;

e.   Awarding attorney's fees and costs to Plaintiffs; and

f.   Granting such other relief as the Court deems equitable and just.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

## COUNT TWELVE
### (*Summary Action – Declaratory Judgment – Specific Performance – as to All Defendants*)

115.   Plaintiffs reassert and reallege the previous allegations as if set forth more fully herein.

116.    Plaintiffs and the Defendants entered into the Agreement which is a legally binding and valid contract.

117.    The Defendants have not performed and have otherwise refused to perform in accordance with the Agreement by failing to provide Plaintiffs with the rights afforded to them under the Agreement, misappropriating, diverting, transferring, funneling, and otherwise disposing of JOMBY's assets, client accounts, business opportunities, revenues, and profits without Plaintiffs' approval and without paying Plaintiffs compensation of equivalent value, competing with JOMBY, and otherwise deviating from the terms of the Agreement.

118.    Plaintiffs demand a declaration that the Agreement is binding, that the specific performance of the Agreement is fair and equitable and not unduly harsh, and that the Defendants must:

a.   Immediately return all previously transferred assets, client accounts, business opportunities, revenues, and profits to JOMBY;

b.   Immediately reinstate JOMBY's YouTube channel and account;

c.   Immediately transfer Defendants' membership and ownership interests in JOMBY to Plaintiffs; and

d.   Immediately take all other actions that the Court deems equitable and just.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

## COUNT THIRTEEN
### (*Summary Action – Injunctive Relief – Emergent Temporary and Permanent Restraints - as to All Defendants*)

119.    Plaintiffs reassert and reallege the previous allegations as if set forth more fully herein.

120.    The Defendants' misappropriation, depletion, diversion, and transferring of JOMBY's assets, client accounts, business opportunities, revenues, and profits, self-dealing, and gutting of JOMBY to Plaintiffs' detriment gives rise to an irreparable harm that cannot be addressed through an award of monetary damages.

121.    Emergent temporary and permanent restraints are necessary to prevent additional irreparable harm to Plaintiffs, to maintain the status quo, and restore the status quo that existed before the Defendants' wrongful conduct.

122.    The legal rights underlying Plaintiffs' application are well settled as the terms of the Agreement are reasonable and certain provisions of the Agreement have already been executed.

123.    The actions that Plaintiffs' seek to enjoin are actionable, as aforesaid, and the requested injunction is reasonably suited to abate such activity.

124.    Plaintiffs have established a preliminary showing of a reasonable probability of success on the merits.

125.    By denying Plaintiffs the requested relief, the relative hardship and injury to Plaintiff will substantially outweigh any hardship or injury to Defendants in granting the relief.

126.    Granting the requested relief furthers the public interest by preventing further acts of fraud and misappropriation and prevents third-parties from unknowingly taking possession of the disputed property and interests.

127.     Plaintiffs' right to the requested relief is clear and the wrong caused by Defendants' aforesaid conduct is manifest.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

## COUNT FOURTEEN
### (*Equitable Accounting - as to All Defendants*)

128.     Plaintiffs reassert and reallege the previous allegations as if set forth more fully herein.

129.     Plaintiff Tarek Holdings and the Defendants are in a fiduciary relationship or a relationship of trust by virtue of their status as co-members of JOMBY, a closely held company.

130.     Plaintiff Abousalem and the Defendants are in a fiduciary relationship or a relationship of trust by virtue of their status as co-founders of JOMBY, a closely held company in which the Defendants are members.

131.     The fiscal accounting as to these interests and statuses are complex and Plaintiffs are of the reasonable belief that the Defendants have not been forthright or otherwise truthful concerning the assets, client accounts, business opportunities, revenues, and profits of JOMBY.

132.     Moreover, in breaching the fiduciary duties aforesaid, the Defendants have misappropriated, diverted, transferred, funneled, devalued, depleted, wasted, and otherwise disposed of the assets, client accounts, business opportunities, revenues, and profits of JOMBY.

28

133.   As a result, Plaintiffs are in need of discovery of the financial and accounting matters affecting their interests in JOMBY.

134.   Plaintiff is without an adequate remedy at law.

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly, severally, and in the alternative, awarding compensatory damages, incidental damages, consequential damages, economic damages, liquidated damages, treble damages, punitive damages, statutory damages, restitution, disgorgement, injunctive relief, specific performance, equitable accounting, pre-judgment interest, reasonable attorneys' fees, disbursements and court costs, and such further relief as the court deems proper and just.

## CERTIFICIATION PURSUANT TO LOCAL CIVIL RULE 11.2

I hereby certify pursuant to L. Civ. R. 11.2 that:

1.   The matter matter in controversy is not the subject of any other action pending in any court, nor of any pending arbitration or administrative proceeding.

2.   This Complaint is verified in accordance L. Civ. R. 11.2, as set forth below.

29

Respectfully submitted,

BLICK LAW LLC


By:    s/ SHAUN I. BLICK, ESQ.
        Shaun I. Blick, Esq.
        sblick@blicklaw.com
        220 Davidson Avenue, Suite 300
        Somerset, New Jersey 08873
        (848) 222-3500 – Phone
        (848) 222-3550 – Fax
        http://www.blicklaw.com
        *Attorneys for Plaintiffs Tarek Holdings, LLC*
        *and Tarek Abousalem*

        Mark A. Speed, Esq.
        mspeed@blicklaw.com
        220 Davidson Avenue, Suite 300
        Somerset, New Jersey 08873
        (848) 222-3500 – Phone
        (848) 222-3550 – Fax
        http://www.blicklaw.com
        *Attorneys for Plaintiffs Tarek Holdings, LLC*
        *and Tarek Abousalem*


Dated:      December 17, 2021

## **VERIFICATION**

STATE OF NEW JERSEY                :
                                                   : ss.
COUNTY OF SOMERSET            :

I, Tarek Abousalem, hereby verify and declare under penalty of perjury that I am member

of Plaintiff Tarek Holdings and a co-founder of Just One More Bite Media Group, LLC, and that

I have read the foregoing Verified Complaint and know the contents thereof, and that the matters

contained in the Verified Complaint are true to my own knowledge, except that those matters

herein stated to be alleged on information and belief and as to those matters I believe them to be

true.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct

to the best of my knowledge.

_____
Tarek Abousalem

Sworn to and subscribed before me this
17th day of December 2021, at Somerset,
New Jersey.

_____
Mark A. Speed, Esq.
Attorney-at-Law of the State of New Jersey

# EXHIBIT A

## Operating Agreement of

## Just One More Bite Media Group, LLC
## A Member-Managed Limited Liability Company

## Dated May 15, 2020

THIS OPERATING AGREEMENT of **Just One More Bite Media Group, LLC**, a Pennsylvania limited liability company (the "Company"), is entered into as of the date set forth above by the Members set forth on Schedule A hereto (individually, a "Member" and collectively, the "Members").

WHEREAS, the Members desire to create this Agreement to define and express the terms and conditions pursuant to which the business of the Company will be operated and the respective rights and obligations of the Members with respect thereto; and

WHEREAS, the Members desire to be bound by this Agreement pursuant to the terms hereof.

NOW, THEREFORE, in consideration of the promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members agree as follows:

## ARTICLE 1

## DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth below:

"**Act**" means the **Pennsylvania Uniform Limited Liability Company Act of 2016**, as amended from time to time.

"**Agreement**" means this Operating Agreement, as the same may be amended, modified, supplemented or restated from time to time.

"**Bankruptcy**" means, with respect to any Member, that such Member shall have (i) made an assignment for the benefit of creditors; (ii) filed a voluntary petition in bankruptcy; (iii) been adjudicated a bankrupt or insolvent or had an order for relief in any bankruptcy or insolvency proceeding entered against the Member; (iv) filed a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (v) filed an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding set forth in (iv) above; (vi) sought, consented to, or acquiesced in the appointment of a trustee, receiver or liquidator of the Member or of all or any substantial part of his properties; (vii) had any proceeding seeking reorganization, arrangement, composition, readjustment, liquidations, dissolution or similar relief under any statute, law or regulation commenced against the Member and such proceeding shall not have been dismissed within one hundred twenty (120)

1

days of its commencement; or (viii) had a trustee, receiver, or liquidator of the Member or all or any substantial part of the Member's properties appointed without the Member's consent or acquiescence and such appointment shall not have been vacated or stayed within ninety (90) days, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated.

"**Capital Account**" means the account established and maintained for each Member on the books of the Company, which is initially equal to the capital contribution of a Member to the Company as set forth in Schedule A hereto and thereafter is: (i) increased by (A) additional cash contributions, if any, made by the Member to the Company; (B) the fair market value to the Member of any property contributed by the Member to the Company (net of any liability assumed by the Company and any liability to which such property is subject); and (C) the amount of any income including income exempt from Federal income tax or gain allocated to the Member for federal income tax purposes; and (ii) decreased by (A) the amount of any Distributions of cash made to the Member; (B) the fair market value to the Company of any Distributions of property made to the Member (net of any liability assumed by the Member and any liability to which such property is subject); (C) the Member's share of any costs paid or incurred by the Company to organize the Company; and (D) the amount of any losses allocated to the Member for federal income tax purposes, all in accordance with federal tax accounting principles. It is intended that the Capital Accounts of all Members shall be maintained in compliance with the provisions of Treasury Regulation Section 1.704-1(b) and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"**Certificate**" means the Certificate of Organization filed with respect to the Company in the office of the Pennsylvania Department of State dated May 15, 2020.

"**Code**" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"**Confidential Information**" means information and data relating to the Company's business, whether the Member has such information and data in such person's memory or embodied in writing or other physical form, including among other things financial information and other business records, internal policies and procedures of the Company and product pricing, marketing practices and plans, and names of customers and their requirements. Confidential Information does not include information which (1) is or becomes generally available to or known by the public other than as a result of improper disclosure by a Member, (2) is obtained by a Member from a source other than the Company so long as the Member, as the case may be, is unaware that such source was bound by a duty of confidentiality to the Company or another party with respect to such information, or (3) is required to be disclosed by a court order or governmental authority, provided reasonable advance notice of such requirement is given to the Company.

"**Company**" means Just One More Bite Media Group, LLC or if the context allows, the Company and any of its subsidiaries.

"**Confidential Materials**" means any document, record, device, or computer software or code, embodying or containing any Confidential Information or Trade Secret.

"**Dissociation**" means the withdrawal, death, removal, resignation, retirement, incapacity, bankruptcy or dissolution of a Member.

"**Distributions**" means distributions of cash or other property made by the Company to the Members. The repayment of any Members' loans made to the Company and any payment of fees to a Member or reimbursements of disbursements shall not be considered Distributions.

"**Income and Gain from Dispositions**" means all net income and gains recognized by the Company for federal income tax purposes resulting from the sale or other disposition of all or a substantial portion of the assets and properties of the Company.

"**Income from Operations**" means all income and gains recognized by the Company for federal income tax purposes, other than Income and Gain from Dispositions.

"**Interest**" means a Member's entire right, title and interest in the Company including a Member's percentage share of Distributions of Net Cash Flow and Net Proceeds from the Company as well as the Member's right to participate in the management and affairs of the Company.  The initial Interest of each Member is set forth on Schedule A attached hereto.

"**Losses from Dispositions**" means all net losses recognized by the Company for federal income tax purposes resulting from the sale or other disposition by the Company of all or a substantial portion of the assets and properties of the Company.

"**Losses from Operations**" means all losses recognized by the Company for federal income tax purposes other than Losses from Dispositions.

"**Net Cash Flow**" means with respect to any fiscal year of the Company the amount calculated as follows: (i) the sum of (a) any Income from Operations; (b) any allowance for depreciation and/or amortization of the cost of assets and properties of the Company; and (c) any funds that have become available to the Company by reason of the reduction of reserves, to the extent not reflected in (a) above; minus (ii) the sum of (a) any Losses from Operations; (b) all amounts paid by the Company or any other borrowing by the Company (including any loans made by Members), other than out of Net Proceeds, the proceeds of borrowings, capital contributions or interest paid by Members with respect to their capital contributions (if any); (c) capital expenditures, other than out of Net Proceeds, the proceeds of borrowings, capital contributions or interest paid by Members with respect to their capital contributions (if any); and (d) increases in reserves not reflected in subparagraph (i)(a) above.

"**Net Proceeds**" means the net cash or other consideration available to the Company as the result of (i) the sale or other disposition of all or a substantial portion of the assets and properties of the Company; and (ii) the giving or refinancing of any lien, security interest or other encumbrance on any real property owned by the Company; in each case less (i) all costs and expenses incident thereto; (ii) the portion, if any, that is reinvested in such real property; (iii) the portion, if any,

that is applied to reduce or discharge any indebtedness of the Company (including loans made by Members); and (iv) the portion, if any, which, in the discretion of the Members, is retained as a reserve for the foregoing or to meet Company obligations.

"**Person**" means any individual, corporation, partnership (general or limited), association, limited liability company, trust, estate or other entity.

"**State**" means the Commonwealth of Pennsylvania.

"**Tax Distribution Amount**" means for any calendar year, an amount equal to (a) the aggregate income of the Company (including items that are separately stated under Code section 702) taxed to the Members for federal income tax purposes for such calendar year multiplied by (b) the sum, expressed as a percentage and reasonably determined by the Members, of (i) the highest marginal federal individual income tax rate in effect for that calendar year (taking into account any surtax and any reduced rate on long-term capital gains (to the extent that the Company's income will be so taxed)) plus (ii) the highest marginal Pennsylvania individual income tax rate in effect for that calendar year.

"**Tax Representative**" has the meaning ascribed to such term in Section 6.6 herein.

"**Trade Secrets**" means any trade secrets of the Company, including compositions, computer programs, concepts, designs, discoveries, formulas, ideas, inventions, know-how, production techniques, methods and processes, and technology used by the Company or related to its business, whether such trade secrets are in a person's memory or embodied in writing or other physical form. For the avoidance of doubt, Trade Secrets shall include, without limitation, any video content, apps and websites used in the business of the Company.

"**Transfer**" means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, gift, or other disposition of Units, including a change in majority ownership of a Member, and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate, give, or otherwise dispose of Units, including changing majority ownership of a Member.

"**Unit**" has the meaning ascribed to such term in Section 3.1 herein.

## ARTICLE II

## ORGANIZATION

2.1 *Name*. The name of the Company shall be **Just One More Bite Media Group, LLC**, and such name shall be used at all times in connection with the business and affairs of the Company. In the event that the Members select an alternate name, then the Company shall file a Certificate of Registration or Alternate Name as required by the Act.

2.2 *Organization of the Company*. The Company shall be organized under the laws of the State on the date of the filing of the Certificate. The Member shall execute or cause to be executed and filed the Certificate and such other documents and instruments with such appropriate authorities

DocuSign Envelope ID: D5FC1635-1EEF-4C18-B559-55D041B58237

as may be necessary or appropriate from time to time to comply with all requirements for the formation and operation of a limited liability company in the State.

2.3 *Purposes of the Company*. The Company's primary business shall be creation of an app and website where users can post and view recipes and other content related to cooking, and download and/or purchase recipes and other cooking-related items (the "Business"). Notwithstanding the foregoing, the Company may engage in any lawful business, purposes or activities permitted by the Act or the laws of any jurisdiction in which the Company may do business, and the Company shall have the authority to do all this necessary, convenient or incidental to accomplish its purposes and operate its businesses as described herein.

2.4 *Registered Office*. The registered office of the Company shall be 1000 Lancaster Avenue, Berwyn, PA 19312. The principal place of business and mailing address of the Company shall be determined by the Members. The Company may maintain additional offices at such locations as the Members deem advisable.

2.5 *Term*. The term of the Company shall commence on the date of the filing of the Certificate, and shall continue in existence until terminated pursuant to the provisions of this Agreement.

2.6 *Title to Company Property*. All of the Company's right, title and interest in and to any tangible property, intangible property, real property, personal property and any and all other assets acquired by the Company shall be held in the name of the Company as an entity. The Members shall not have an ownership interest in any property of the Company in their individual names. The Members' interests shall be personal property for all purposes.

2.7 *No State Law Partnership*. The Members intend that the Company shall not be a partnership or joint venture, and that no Member shall be a partner or joint venturer of any other Member in connection with this Agreement, for any purpose other than federal, state and local tax purposes, and the provisions of this Agreement shall not be construed otherwise.

## ARTICLE III

## UNITS, CAPITAL CONTRIBUTIONS AND INTERESTS

3.1 *Units*. Interests in the Company are represented by units ("Units"), with each Unit representing a fractional part of the Interests of all Members (or assignees, as the case may be) equal to the quotient of one divided by the total number of Units outstanding at any time, except as otherwise provided herein. Units may be expressed in whole or in fractions. Each Member shall initially have the Units set forth on Schedule A hereto.

3.2 *Initial Members and Initial Capital Contributions*. The initial Members of the Company are listed on Schedule A hereto, each of which has executed this Agreement as of the date hereof and is hereby admitted to the Company as a Member. In consideration for capital contributions provided or to be provided to the Company, the Members have been credited with capital contributions and Interests specified on Schedule A hereto. The Members shall update Schedule

DocuSign Envelope ID: D5FC1635-1EEF-4C18-9F59-95B044B58237

A hereto as necessary to reflect any corresponding change in the ownership of Units or Interests as a result of any additional capital contributions made by the Members (in accordance with the provisions of Section 3.3 of this Agreement) or any other permitted change in ownership of Units or Interests. Updates of Schedule A pursuant to the preceding sentence shall not be deemed an amendment to this Agreement.

3.3 *No Other Capital Contributions Required.*

(a) Except as agreed to by the Members, no Member shall be required to contribute any capital in addition to the contribution described in Section 3.2. The Members may make additional voluntary capital contributions upon the approval of the Members and such voluntary contributions shall alter the Interests as agreed upon by the Members.

(b) Notwithstanding anything to the contrary in this Agreement, if a Member has rightfully received a return, by cash Distribution or otherwise, of the whole or any part of his capital contribution to the Company, such Member shall remain liable to the Company for any sums (not in excess of the capital so returned, with interest) necessary to discharge the Company's liabilities to creditors who extended credit or whose claims arose before such return.

3.4 *No Priority.* No Member shall be entitled to any Distributions from the Company or to withdraw or demand the return of any part of his capital contribution except as specifically provided for herein. No Member shall have the right to demand or receive property other than cash in return for his capital contribution or as a Distribution of income. No Member shall have priority over any other Member either as to the return of his capital contribution to the company or as to any Distributions except as specifically provided for herein. No Member shall have any personal liability for the return of the Capital Contribution of any other Member.

3.5 *Interest and Withdrawals.* No interest shall be paid on any capital contributions. Except as otherwise provided herein, no Member shall be entitled to withdraw any part of his capital contributions.

## ARTICLE IV

## MANAGEMENT OF THE COMPANY; RIGHTS AND OBLIGATIONS OF MEMBERS AND OFFICERS; EXCULPATION

4.1 *Management of Business.* The Company shall be managed by the Members, who shall have the right to act for and bind the Company in the ordinary course of its business; provided, however, that all actions excluding incidental actions must be approved as set forth in Section 4.5(b).  The Members shall be subject to all duties and shall have all of the authority with respect to the business and affairs of the Company that managers have under the Act and this Agreement, including, without limitation, the right:

(a) to execute any and all agreements, contracts, documents, certifications and instruments necessary or convenient in connection with the development, financing, management, maintenance, operation and disposition of any Company asset;

DocuSign Envelope ID: D5FC1635-1EEF-4C18-9F59-55BD41B58237

(b) to appoint accountants and other professional service providers for the Company or any subsidiary of the Company, and individuals to serve as officers of the Company with such titles and duties as the Members may select.

(c) to borrow money from the Members or third parties, to issue evidences of such indebtedness as is necessary, convenient or incidental to the accomplishment of the purposes of the Company, and to secure the same by mortgage, pledge or other lien on any Company asset;

(d) to prepay in whole or in part, renew, refinance, recast, consolidate, increase, modify or extend any debt of the Company, including any mortgage debt affecting or encumbering any of the Company's real property, and in connection therewith to execute and record any documents relating thereto;

(e) to pay out of Company funds any and all fees and make any and all expenditures necessary or appropriate in connection with the organization of the Company, the management of the affairs of the Company, and the carrying out of the Members' obligations and responsibilities under this Agreement;

(f) except as otherwise provided herein, to do anything which the Members deem necessary or appropriate for the protection and preservation of the Company's assets;

(g) except as otherwise directed by a Tax Representative if one shall be appointed by the Members as provided in Section 6.6, with respect to those matters within the powers of the Tax Representative, to make and revoke any election permitted to the Company by any taxing authority in such manner as the Members decide, and to cause to be paid any and all taxes, charges and assessments that may be levied, assessed or imposed upon any of the assets of the Company, unless the same are contested by the Tax Representative, which the Tax Representative is hereby expressly authorized to do; and

(h) except as otherwise provided herein, to engage in any kind of activity and perform and carry out contracts of any kind necessary to, in connection with, or incidental to the accomplishment of the purposes of the Company as may be lawfully carried on or performed by a limited liability company under the laws of the State of Delaware and in each state where the Company is then formed, has qualified or is doing business.

4.2 *Officers.* The Members may from time to time appoint and dismiss officers of the Company. Such officers shall exercise such powers, have such authority and perform such duties as are determined from time to time by the Members. The officers of the Company shall serve at the pleasure of the Members and shall receive such compensation as determined by the Members. Each of the initial Members shall be a Co-Founder. The initial officers of the Company are Greg Shockley who shall occupy the position of Acting CEO; Tarek Abousalem who shall occupy the position of Chief Digital Officer; and James Shockley who shall occupy the position of Chief Operating Officer. The anticipated roles of the Members in accordance with these positions is set forth on Schedule B hereto. The Members shall allocate such time to the Company as they deem reasonably necessary for the performance of their roles.

DocuSign Envelope ID: D5FC1635-1EEF-4C18-BF59-5EBD14B5B237

4.3 *Liabilities of Members*. The Members shall have no personal liability with respect to liabilities and obligations of the Company and shall not be required to make any contributions to the capital of the Company other than their capital contributions provided for in Sections 3.1 and 3.2 hereof.

4.4 *Other Compensation*. Except as approved by the Members, the Members shall not be entitled to any fees, commissions, or other compensation from the Company for any services rendered to or performed for the Company.

4.5 *Meetings and Voting by Members*.

(a) A meeting may be called at any time and shall be held at the Company's principal place of business or at any other place designated by the Member calling the meeting. Not less than five (5) nor more than thirty (30) days before each meeting, the Member calling the meeting shall give written notice of the meeting to each Member entitled to vote at the Meeting. The notice shall state the time, place and purpose of the meeting. Notwithstanding the foregoing provisions, the Member who is entitled to notice shall be deemed to have waived notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than fifty-one (51%) of the Interests then held by Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by his duly authorized attorney in fact.

(b) Whenever this Agreement requires "written consent", "consent", "approval" or "election" by Members, the affirmative votes of 51% of the Interests shall control. Notwithstanding the foregoing, all technology- or marketing-related decisions shall be made by Tarek Holdings, LLC.

(c) In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of all the Members. Members may participate in a meeting of the Members by means of conference telephone or other similar communications equipment by means of which all persons participating in the meeting can immediately communicate with all other persons participating in the meeting, and participation by such means shall be deemed to constitute presence in person at a meeting of the Members.

4.6 *Extraordinary Decisions*. Notwithstanding the foregoing, the unanimous consent of the Members shall be required in order to:

(a) transfer all or substantially all of the Company's assets;

(b) file or support any petition for, or otherwise declare or support a declaration of, the bankruptcy of the Company;

(c) dissolve, liquidate or otherwise wind up the business of the Company;

DocuSign Envelope ID: D5FC1635-1EEF-4C18-8F59-65D041B5B237

(d) permit the merger or consolidation of the Company with another person;

(e) borrow money from the Members or third parties or to issue evidences of such indebtedness involving amounts in excess of Ten Thousand Dollars ($10,000), or to secure the same by mortgage, pledge or other lien on any Company asset;

(f) prepay in whole or in part, renew, refinance, recast, consolidate, increase, modify or extend any debt of the Company involving amounts in excess of Ten Thousand Dollars ($10,000), including any mortgage debt affecting or encumbering any of the Company's real property;

(g) approve a transaction involving an actual or potential conflict of interest between any Member and the Company;

(h) amend or restate the Articles of Organization of the Company or this Agreement;

(i) change the nature of the Company's business;

(j) issue additional Units or to add a Member;

(k) make any payment for any reason to any third party or Member in an amount greater than Ten Thousand Dollars ($10,000.00);

(l) pay any compensation or salary to the Members in connection with their performance of services for the Company; or

(m) make any distribution to the Members.

4.7 *Exculpation and Indemnification*.  The Members shall not be liable and the Company shall indemnify, to the fullest extent permitted by law, any current, former or future member, manager, officer or employee of the Company against all losses, liabilities, costs and expenses, including, without limitation, attorneys', accountants' and experts' fees and expenses, judgments, fines, amounts paid in settlement and any costs incurred in establishing entitlement to indemnification (collectively "Losses"), arising out of related to any threatened, pending or completed third party claim, action or proceeding (any of the foregoing, an "Action") in which such person may be involved as a party or otherwise, by reason of his being or having been a member, manager, officer or employee of the Company, including service with respect to any criminal action or proceeding, if such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company and had no reasonable cause to believe his conduct was unlawful.  Such indemnification shall not extend to actions or omissions which are found to be grossly negligent, intentional misconduct or knowing violations of law.  The right of indemnification provided in this Section 4.7 shall be in addition to any rights to which such person may otherwise be entitled by contract or as a matter of law, and shall extend to successor and assigns.  Expenses incurred by any such person in defending an Action or establishing entitlement to indemnification shall be paid by the Company in advance of the final disposition of such Action upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall be ultimately determined that he is not entitled to indemnification by the Company.  Notwithstanding the foregoing, any indemnity under this Section 4.7 shall be

provided out of and to the extent of Company assets only, and the Members shall not have any obligation towards same.

**ARTICLE V**

**COMPANY DISTRIBUTIONS, PAYMENT OF CONSIDERATION, ALLOCATIONS OF INCOME, LOSS AND CREDIT**

5.1 *Distributions of Net Cash Flow and Net Proceeds Generally*. The Members shall determine whether and when to (a) make Distributions of Net Cash Flow and Net Proceeds and (b) retain such funds in the Company as they deem necessary to cover the Company's reasonable business needs, which shall include reserves against possible losses and the payment or making provision for the payment, when due, of obligations of the Company and obligations secured by, or by lien on, or security interest in, property of the Company; <u>provided</u>, <u>however</u>, that for any calendar year, the Company shall distribute in cash, no less than the Tax Distribution Amount to the Members. The Company shall endeavor to make such minimum distributions by no later than seventy-five (75) days following the end of the calendar year as shall enable the Members to use such distributions to satisfy their estimated and final income tax for the calendar year. Any minimum distributions to a Member pursuant to this Section 5.1 shall be treated as an advance on the distributions to be made to such Member pursuant to Section 5.2, and shall reduce such distributions accordingly.

5.2 *Distributions of Net Cash Flow*. Any Net Cash Flow shall be distributed to Members *pro rata* in accordance with each Member's Interest.

5.3 *Distributions of Net Proceeds*. Any Net Proceeds shall be distributed to Members *pro rata* in accordance with each Member's Interest.

5.4 *Allocations*

(a) Income from Operations and Losses from Operations shall be allocated to the Members *pro rata* in accordance with the Interests.

(b) Subject to Section 5.6, Income and Gain from Dispositions and Losses from Dispositions shall be allocated to the Members as follows:

(i) Income and Gain from Dispositions shall first be allocated to Members with deficit Capital Accounts in proportion to such deficits until all such deficits have been eliminated, the balance, if any, to be allocated to the Members *pro rata* in accordance with the Interests.

(ii) Losses from Dispositions shall first be allocated to Members in proportion to any positive balance in respective Capital Accounts until such positive balances have been eliminated, the balance, if any, to be allocated to the Members *pro rata* in accordance with the Interests.

5.5 *Allocations of Tax Credits*. Subject to Section 5.6, all tax credits to which the Company shall be entitled under the Code shall be allocated to the Members in accordance with the ratio in

DocuSign Envelope ID: D5FC1635-1EEF-4C18-9E59-6E8D41B58237

which the Members divide the taxable income of the Company (within the meaning of Section 702(a)(8) of the Code) for the taxable year in which the credit arises, regardless of whether the Company realizes a profit or sustains a loss for such taxable year.

5.6 *Special Allocations*.

(a) No Member shall be allocated any item of loss or deduction to the extent said allocation will cause or increase any deficit in said Member's Capital Account, in excess of the amount such Member is obligated or deemed obligated to restore pursuant to <u>Treasury Regulation § 1.704-1(b)(2)(ii)(f)</u>, as of the end of the Company's tax year to which such allocation relates. In determining the above, a Member's Capital Account shall be reduced for the items described in <u>Treasury Regulations §§ 1.704-1(b)(2)(ii)(d)(4), (5) and (6)</u>.

If any Member with a deficit in his Capital account unexpectedly receives any adjustment, allocation or distribution described in <u>Treasury Regulations §§ 1.704-1(b)(2)(ii)(d)(4), (5) and (6)</u>, then Company items of income and gain shall be specifically allocated to such Member in an amount and manner sufficient to eliminate the deficit in said Member's Capital Account created by such adjustment, allocation, or distribution as quickly as possible.

The Members intend that the provisions set forth in this Section will constitute a "Qualified Income Offset" as described in <u>Treasury Regulation § 1.704-1(b)(2)(ii)(d)</u>. The regulations shall control in the case of any conflict between those Treasury Regulations and this Section.

(b) The following provisions shall be applicable in the first taxable year in which the Company has nonrecourse deductions as defined in <u>Treasury Regulation § 1.704-2(b)(1)</u>:

(i) If at the close of any taxable year of the Company there is a net decrease in Minimum Gain (as defined in (ii) below), and the portion of the aggregate deficit Capital Account balance of all Members having deficit Capital Account balances at the end of such year that result in whole or in part from the allocation of losses or deductions attributable to Company nonrecourse indebtedness ("Deficit Nonrecourse Balances") exceeds (but not for the application of this Section 5.6(b)(i)) the Minimum Gain, if any, then to the extent of such excess (referred to as the "Minimum Gain Deficiency"), Company income and gain, if any, shall be allocated, before any other allocation is made, to each Member having a Deficit Nonrecourse Balance. Any such allocation shall be made in the proportion that such Member's Deficit Nonrecourse Balance bears to the aggregate Deficit Nonrecourse Balances of all Members. In allocating the income and gain pursuant to the previous two sentences, gains recognized from the disposition of Company assets subject to nonrecourse liabilities of the Company shall be allocated first to the extent of the decrease in Minimum Gain attributable to the disposition of said asset. Thereafter, any income and gain to be allocated shall consist of a pro rata amount of other Company income and gain for that year. Any allocation under this Section 5.6(b)(i) shall be made no later than the end of the tax year in which such Minimum Gain Deficiency arises; provided, however, that in no event shall there be a reallocation of any item of income, gain, loss or deduction previously allocated among the Members pursuant to this Agreement. Any special allocations of income or gain under this Section 5.6(b)(i) shall be taken into account in computing subsequent allocations of Net Profits and Net Losses, so that to the extent possible the aggregate amounts of Net Profits

DocuSign Envelope ID: D5FC1635-1EEF-4C18-BF59-65DD41B58237

and Net Losses allocated to each Member will be equal to the aggregate amounts that would have been allocated to them in the absence of the allocations contained in this Section 5.6(b)(i). For purposes of this Section 5.6(b)(i), Distributions made prior to or contemporaneous with any allocation to a Member shall be reflected in such Member's Capital Account prior to making such allocation. Allocations of income and gain under this Section 5.6(b)(i) shall not exceed the sum of the Company Minimum Gain Deficiency and Minimum Gain. The Members intend that this Section 5.6(b)(i) will constitute a "Minimum Gain Chargeback" as set forth in Treasury Regulation § 1.704-2(f).

(ii) "Minimum Gain" means the total gain which the Company would realize if it sold, in a taxable disposition, each of its assets which were subject to nonrecourse liabilities in full satisfaction of the liabilities. In computing said gain, only the portion of the assets' basis allocated to nonrecourse liabilities of the Company shall be taken into account.

(c) In accordance with Code § 704(c) and the Treasury Regulations thereunder, any Inherent Gain (as defined below) with respect to any property contributed to the capital of the Company shall be allocated to the Member contributing such property at the time such Inherent Gain is recognized by the Company. In addition, depreciation attributable to such property shall be allocated among the Members in accordance with the Treasury Regulations under Code § 704(c). Allocations pursuant to this subparagraph are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account, in computing any Member's Capital Account or share of profits, losses, other items or distributions pursuant to any provision of this Agreement. For purposes of this Section 5.6(c), "Inherent Gain" shall be the difference between the fair market value of the property contributed to the Company (unreduced by any liabilities secured by the property or to which the property is subject) and the adjusted basis of said property, determined immediately before the contribution of said property to the Company.

(d) In the event any Member's Interest shall change during any taxable year, notwithstanding any other provision of this Agreement, the Company's Income or Loss from Operations and Income and Gain or Loss from Dispositions, and each item of income, deduction or credit of the Company with respect to such Member shall be allocated in a manner which takes into account the Member's varying Interest during such taxable year and in a manner consistent with the requirements of Section 706 of the Code, or equivalent legislation and applicable Treasury Regulations.

(e) If the Code or any applicable Treasury Regulations shall require that any item of income, deduction, gain, loss or credit of the Company be allocated among the Members in a manner inconsistent with the allocations provided for in this Article in order to be respected by the Internal Revenue Service, then, notwithstanding any other provision of this Agreement, all such items shall be reallocated in a manner which conforms with the Code or any applicable Treasury Regulations and most closely approximates the allocations otherwise provided for in this Article.

5.7 *Binding Effect*. The Members are aware of the income tax consequences of the allocations made by this Article V and hereby agree to be bound by the provisions of this Article V in reporting their shares of Company income, gain, loss and deduction for Federal income tax purposes.

DocuSign Envelope ID: D5FC1635-1EEF-4C18-8F59-5FBD41B5B237

5.8 *Tax Elections*. The Members may make such elections for Federal income tax purposes that they reasonably determine to be in their best interests.

## ARTICLE VI

## RECORDS, REPORTS AND TAXES

6.1 *Fiscal Year*. The fiscal year of the Company for both accounting and Federal income tax purposes shall end on December 31 of each year, and, for accounting and Federal income tax purposes the Company shall report is operations and profits and losses in accordance with the cash method of accounting.

6.2 *Books and Records*. At all time during the continuance of the Company, the Members shall keep or cause to be kept full and faithful books of account in which shall be entered fully and accurately each transaction of the Company. All of the books of account shall at all times be maintained at the principal office of the Company and/or at the office of the Company's accountants, or at such other place as the Members shall determine. The Members and their respective attorneys, accountants and other advisors, shall have the right at all times during regular business hours, to examine, review, audit, and make copies of the books and records of the Company.

The Members shall maintain all information relating to the Company contained in such reports and books and records in strict confidence. The Members making such examination, review, audit or copying shall bear all of the expenses incurred by such Members and the Company in any such examination, review, audit and copying.

6.3 *Reserved*.

6.4 *Reports*. If requested by any Member, the Company shall provide the Members with a quarterly report of the Company's operations, which shall include income statements of the Company for such quarter and for the year to date, by no later than the end of the month succeeding such calendar quarter.

6.5 *Tax Status*. The Members hereby recognize that the Company will be recognized as a partnership for Federal and State tax purposes and will be subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the Code. The Members shall use all reasonable efforts to cause the Company's accountants to prepare and make timely filings of all tax returns and statements which the accountants determine must be filed on behalf of the Company with any taxing authority and to provide copies of such returns and statements to each Member prior to thirty (30) days before the due date (computed without regard to any extensions thereof) and actual filing of such return.

6.6 *Tax Representative; Tax Returns; Elections*.

(a) Greg Shockley shall be the Company's designated "partnership representative" within the meaning of Section 6223 of the Code (the "Tax Representative"). The Tax Representative shall

13

DocuSign Envelope ID: D5FC1635-1EEF-4C18-BF59-65D0411B58237

not be required to be a Member. The Company grants to the Tax Representative the sole authority to act on behalf of the Company for the purposes set forth in Section 6223(a) of the Code. The Tax Representative shall be reimbursed for all reasonable fees, costs and expenses incurred in performance of its duties.

(b) The Company and its Members agree that if the Company qualifies to make an election pursuant to Section 6221(b) of the Code, to have Subchapter C of Chapter 63 of the Code not apply with respect to the Company for any taxable year (an "Opt-Out Election"), then the Company shall make an Opt-Out Election for such taxable year.  In such event, the Company and the Members shall take such actions as shall cause the Opt-Out Election to be effective.

(c) If any "partnership adjustment" as defined in Section 6241(2) of the Code ("Partnership Adjustment") is determined with respect to the Company, the Tax Representative shall promptly notify the Members upon the receipt of a notice of final Partnership Adjustment, and shall take such actions as may be directed by the consent of the Members in writing within thirty (30) days following the receipt of such notice, including whether to file a petition in Tax Court, cause the Company to pay the amount of any such adjustment under Code Section 6225, or make the Alternative Regime Election; provided however in the event the Members do not provide the Tax Representative with such direction, the Tax Representative shall make the Alternative Regime Election.

(d) If any Partnership Adjustment is finally determined with respect to the Company and the Tax Representative has not caused the Company to make the Alternative Regime Election then the Members shall take such actions as may be requested by the Tax Representative, including filing amended tax returns and paying any tax due in accordance with Section 6225(c)(2) of the Code. The Tax Representative shall use commercially reasonable efforts to make any modifications available under Sections 6225(c)(3), (4) and (5) of the Code.  Any "imputed underpayment" (as determined in accordance with Section 6225 of the Code) or Partnership Adjustment that does not give rise to an imputed underpayment, shall be apportioned among the Members for the taxable year in which the adjustment is finalized in such manner as determined by the Tax Representative in good faith so that, to the maximum extent possible, the tax and economic consequences of the Partnership Adjustment, including applicable interest and penalties are borne by the Members in accordance with their respective Interests for the reviewed year.

(e) The obligations of each Member or former Member under this Section 6.6 shall survive the Transfer or redemption by such Member of its Interest and the termination of this Agreement or the dissolution of the Company.

(f) The Tax Representative shall cause all income tax and information returns of the Company to be prepared by the Company's accountant and shall cause such tax returns to be timely filed with the appropriate authorities. Copies of such tax and information returns shall be kept at the principal office of the Company or at such other place as the Tax Representative shall determine and shall be available for inspection by the Members or their representatives during normal business hours.

(g) The Company may, but is not required to, make an election for Federal income tax purposes

14

to the extent permitted by applicable law and regulations, as follows:

(i) in case of a Transfer of all or part of the Members' Interests, the Company may elect in a timely manner pursuant to Section 754 of the Code and pursuant to corresponding provisions of applicable state and local tax laws to adjust the bases of the assets of the Company pursuant to Sections 734 and 743(i) of the Code; and

(ii) all other elections required or permitted to be made by the Company shall be made in such a manner as the Members, in consultation with the Company's attorneys or the Company's accountants, determine to be most favorable to the Members.

(h) Members shall not take any action or refuse to take any action which would cause the Company to forfeit the benefits of any tax election previously made or agreed to be made by the Company.

**ARTICLE VII**

**TRANSFER OF COMPANY INTERESTS; ADMISSION OF MEMBERS; WITHDRAWAL OR DEATH OF MEMBERS**

7.1 *Restriction on Transfer*. Except as otherwise provided in Section 7.2 hereof, the Members may not assign or otherwise Transfer all or any part of a Member's Interest or grant or create any participation in such Member's right to receive Distributions or returns of capital. Any transaction by a Member in violation of the provisions of this Section 7.1 shall, as between such Member on the one hand and the Company and the other Members on the other hand, be null and void.

7.2 *Permitted Transfers*. Members may sell, assign or Transfer all or any portion of the Member's Interest to (a) another Member; provided however, that each Member must be given prior notice of such proposed Transfer and shall have the right to participate in such Transfer *pro rata* in accordance with the Interests, or (b) any trust(s) or other estate planning vehicle established for the benefit of the transferring Member, so long as the Member controls all voting power with respect to such trust or estate planning vehicle. Members may not sell, assign or Transfer all or any portion of a Member's Interest to a Person other than a Member without the prior unanimous written consent of the other Members; provided, however, that a Member may Transfer the Member's share of income, gain, deductions, credits, and losses and the return of the contributions to which the selling, assigning or transferring Member would otherwise be entitled, without the consent of the other Members, but such assignee or transferee shall not become a Member and shall have no right to participate in the management of the Company and vote on matters coming before the Company. The Members hereby acknowledge the reasonableness of the restrictions contained in this Section 7.2 in view of the purposes of the Company.

7.3 *Effective Date of Transfers*. For financial and tax reporting purposes, every voluntary sale, assignment or other Transfer (as distinguished from the original issuance) of any Interest or portion thereof shall be deemed to have occurred as of the close of business on the day of the

15

month in which such event shall have in fact occurred, and every involuntary sale, assignment or permitted Transfer (whether by gift, bequest, inheritance, operation of law or any other method) of any Interest of Members in the Company shall be deemed to have occurred, and shall have no prior effect, as of the close of business on the day of the calendar month in which the Company shall have received evidence of such Transfer.

7.4 *Conditions Applicable to Transfers*. Notwithstanding anything to the contrary contained in this Agreement, no change in ownership of the Interests of Members shall be binding upon the Company unless and until (i) true copies of instruments of Transfer executed and delivered pursuant to or in connection with such Transfer shall have been delivered to the Company; (ii) the transferee shall have delivered to the Company an executed and acknowledged assumption agreement pursuant to which the transferee assumes all of the obligations of the transferor hereunder, and agrees to be bound by all of the provisions of this Agreement (including, without limitation, if pursuant to the provisions of this Agreement, the transferee is to become, as a result of such Transfer, a Member of the Company, an acknowledgment thereof); and (iii) the transferee shall have executed, acknowledged and delivered any instruments required under the Act to effect such Transfer.

7.5 *Transferees by Operation of Law*. If, notwithstanding the provisions of this Article VII, any Person acquires all or any part of the Interest of a Member in violation of this Article VII by operation of law or judicial proceeding, the holder(s) of said Interest shall be entitled to receive only the share of income, gain, deductions, credits, and losses and the return of contributions to which said Member would otherwise be entitled, and said Person shall have no right to participate in the management of the Company and vote on matters coming before the Company.

7.6 *Admission of Additional Members*. Except as otherwise provided, no additional Members may be admitted to the Company without prior unanimous consent of the Members.  Such additional Members shall execute and acknowledge a counterpart to this Agreement or shall otherwise evidence in writing their agreement to be bound by the terms hereof in such manner as the Members shall determine.

## ARTICLE VIII

## DISSOLUTION, LIQUIDATION AND TERMINATION

8.1 *Dissolution*.

(a) The Company shall be dissolved upon the earlier to occur of any of the following events:

(i) The sale, exchange or other disposition by the Company of all or substantially all of the Company's assets;

(ii) The unanimous consent of the Members;

(iii) Any other event, which, under the Act, would cause the dissolution of a limited liability company, unless all of the remaining Members elect to continue the business of the Company.

DocuSign Envelope ID: D5FC1635-1EEF-4C18-8F59-65BD44B5B237

(b) Dissolution shall be effective on the date of the event giving rise to the dissolution, but the Company shall not terminate until the assets thereof have been distributed in accordance with the provisions hereinafter set forth.

8.2 *Liquidating Trustee*.

(a) Upon dissolution of the Company, the liquidating trustee(s) (who shall be the remaining Member(s) or, if there is no remaining Member, the last Person to be a Member or the legal or personal representatives of the Person who was last a Member) shall proceed diligently to wind up the affairs of the Company and distribute its assets in the following order of priority:

(i) To the payment of the debts of the Company (other than those to Members) and the expenses of liquidation;

(ii) To the setting up of such reserves as the liquidating trustee(s) may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the Company; provided that any such reserve shall be paid over the liquidating trustee(s) to a Person (if an individual, not a Member or one in the employ of any Member), as escrowee, to be held by such Person (or designated successor) for the purpose of disbursing such reserves in payment of any of the aforementioned contingencies and, at the expiration of such period as the liquidating trustee(s) shall deem advisable, to distribute the balance thereafter remaining in the manner hereinafter provided;

(iii) To the repayment of any advances that may have been made by any of the Members to the Company, but if the amount available for such repayment shall be insufficient, then pro rata in accordance with the amounts of such advances; and

(iv) To the Members in accordance with their Capital Accounts.

(b) Pending such distribution, the liquidating trustee(s) shall continue to exploit the rights and properties of the Company consistent with the liquidation thereof, exercising in connection therewith all the power and authority of the Members as herein set forth.

8.3 *Accounting on Distribution*. Upon dissolution of the Company, the liquidating trustee(s) shall cause the Company's accountant to make a full and proper accounting of the assets, liabilities, and operation of the Company, as of and through the last day of the month in which the dissolution occurs.

8.4 *Distribution in Kind*. Members shall not have the right to demand and receive property other than cash. The liquidating trustee(s) shall, in any event, have the power to sell the Company's assets for cash in order to provide for payment of liabilities and establish a reserve as aforesaid or otherwise. All saleable assets of the Company may be sold in connection with any liquidation at public or private sale at such price and upon such terms as the liquidating trustee(s), in his or their sole discretion may deem advisable. Members and any Person in which any Member is in any way interested may purchase assets at such sale. Distributions of Company assets may be

DocuSign Envelope ID: D5FC1635-1EEE-4C18-9E59-65D0411B58237

made in cash or in kind, in the sole and absolute discretion of the liquidating trustee(s).

## ARTICLE IX

## FIDUCIARY DUTIES; CONFIDENTIALITY; INTERESTED TRANSACTIONS; LOANS BY MEMBERS

9.1 *Fiduciary Duties*.

(a) *Standard of Care*.  A Member will not be liable to the Company or any Member for an act or omission done in good faith to promote the Company's best interests, unless the act or omission constitutes gross negligence, intentional misconduct or a knowing violation of law.  A Member may rely on the Company's records maintained in good faith and on information, reports or statements received from any person pertaining to matters such Member reasonably believes to be within the person's expertise or competence.

(b) *No Competing Activities*.  A Member may not participate in any business or activity which competes with the Company directly or indirectly, without the unanimous consent of the other Members. The Member requesting to participate in a competing activity shall not vote on the matter. A competing activity shall be any activity that engages in any aspect of the Business or any activity that is substantially similar to the Business. The Members agree that catering and event planning shall not be deemed activities that are substantially similar to the Business.

9.2 *Confidentiality*.  Each Member acknowledges that (a) during such person's association with the Company, and in the course of that association, such Member will have access to Confidential Information and Trade Secrets of the Company, (b) the Confidential Information and Trade Secrets are the property of the Company, and (c) public disclosure of the Confidential Information or the Trade Secrets could have an adverse effect on the Company and its business. Both during and after such Member's association with the Company, such Member will not disclose to anyone outside the Company, or use for any purpose other than for the exclusive benefit of the Company, any Confidential Information or Trade Secrets.  Further, such Member will not remove from the Company's premises (except to the extent such removal is essential to the performance of such Member's duties at home or while traveling or except as otherwise specifically authorized by the Company) Confidential Materials.  When a Member's association with the Company is terminated or upon the earlier request of the Company, such Member will return to the Company all of the Confidential Materials in such Member's possession or subject to such Member's control and such Member will not retain any copies, abstracts, sketches, data bases, disks or other physical embodiment of any of the Confidential Materials.  The provisions of this Section 9.2 shall survive the termination of this Agreement, the Dissociation of any Member and any other event that terminates any obligations of any Member under this Agreement.

9.3 *Interested Transactions*.  Any Member may act as attorney for, deal and contract with and be employed by, and enter into a business transaction with, the Company, and any Member may be in any manner interested in or connected with any corporation, association or business in which the Company is directly or indirectly interested, all in the same manner and with the same

18

DocuSign Envelope ID: D5FC1635-1EEF-4C18-8F59-659D41B5B237

freedom as though not a Member and without accountability for any profit, benefit or compensation received in connection with such actions or relationships, none of which shall be void or voidable by reason of such relationship.

9.4 *Loans by Members*.  Upon the consent of the Members as provided herein, any Member may make loans or lend money to the Company or advance monies on its behalf, which loans or advances shall be repayable on such terms and conditions as shall be agreed upon by the advancing Member and the other Member(s).

## ARTICLE X

## GENERAL

10.1 *Notices*. Any notice or consent required or provided for by any provisions of this Agreement shall be in writing and shall be deemed to have been duly and properly given or served for any purpose only if (a) delivered personally with receipt acknowledged, (b) sent by registered or certified mail, return receipt requested, postage and charges prepaid and addressed to such address of the Member set forth in Schedule A to this Agreement, (c) sent by first class mail, or (d) e-mailed to an address known to be the recipient's email address.  A notice to the Company must be addressed to the Company's registered office.  A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice that is sent by mail will be deemed given three (3) business days after it is mailed.  A notice e-mailed during business hours shall be deemed given on the same business day; any notices e-mailed outside of business hours will be deemed delivered the next business day.  Any party may designate, by written notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

A Member may change the Member's address for the purpose of this Section 10.1 by notice to the Company at its principal office in the manner herein provided for. Any such notice, consent or other communication shall be deemed to have been given the day it was (i) received by the Company or (ii) personally delivered with receipt acknowledged.

10.2 *Further Assurances*. The parties hereto agree to execute, acknowledge, deliver, file, record and publish such further certificates, instruments, agreements and other documents, and to take all such further action as may be required by law or deemed to be necessary or useful in furtherance of the Company's purposes and the objectives and intentions underlying this Agreement and not inconsistent with the terms hereof.

10.3 *Prohibition Against Partition*. The Members hereby permanently waive and relinquish any and all rights they may have to cause all or any part of the property of the Company to be partitioned, it being the intention of the Members to prohibit any Member from bringing a suit for partition against the other Members, or any of them.

10.4 *Waiver*. No consent or waiver, express or implied, by Members to or of any breach or default by any Member in the performance by any Member of obligations hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the

performance by such Member of the same or any other obligation of such Member hereunder. Failure on the part of a Member to complain of any act or failure to act of any other Member or to declare such other Member in default, irrespective of how long such failure continues, shall not constitute a waiver by such Member of rights hereunder.

10.5 *Severability*. If any provision of this Agreement or the application thereof to any person or circumstances shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

10.6 *Additional Remedies*. The rights and remedies of Members hereunder shall not be mutually exclusive. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it limit or affect, any other rights in equity or any rights at law or by statute or otherwise of any party aggrieved as against the other for breach or threatened breach of any provision hereof, it being the intention of this Section 10.6 to make clear the agreement of the parties hereto that their respective rights and obligations hereunder shall be enforceable in equity as well as at law or otherwise.

10.7 *Choice of Law*. This Agreement and all matters relating to the Company shall be governed and construed in accordance with the law of the Commonwealth of Pennsylvania.

10.8 *Entire Agreement*. This Agreement incorporates the entire agreement among the parties hereto, regardless of anything to the contrary contained in the Certificate or other instrument, memorandum or notice purporting to summarize the terms hereof, whether or not the same shall be recorded or published.

10.9 *Amendments*. This Agreement may not be modified or amended except with the unanimous written consent of the Members.

10.10 *Gender and Number*. Unless the context otherwise requires, when used herein, the singular includes the plural and vice versa, and the masculine includes the feminine and vice versa.

10.11 *Benefit*. Subject to Transfer restrictions set forth in Article VII, this Agreement is binding upon and inures to the benefit of the parties hereunder, their heirs, legal representatives, successors and permitted assigns.

10.12 *Captions*. Captions are inserted for convenience only and shall not be given any legal effect.

10.13 *Execution*. This Agreement may be executed in any number of counterparts, and each such counterpart will, for all purposes, be deemed an original instrument, but all such counterparts together will constitute but one and the same agreement.

10.14 *Investment Representation*. Each Member represents to the Company and the other Members that (a) the Member is acquiring his Interest in the Company for investment and for the

DocuSign Envelope ID: D5FC1635-1EEF-4C18-8F59-5E8D44B58237

Member's own account and not with a view to its sale or distribution, and (b) neither the Company nor the other Member(s) has made any guaranty or representation upon which the Member has relied concerning the possibility or probability of profit or loss resulting from the Member's investment in the Company.  Each Member also acknowledges that the Interests have not been registered under the Securities Act of 1933, as amended, and may not be offered, sold or otherwise Transferred, pledged or hypothecated unless and until such interests are registered under such Act or an opinion of counsel satisfactory to the Company is obtained to the effect that such registration is not required.

10.15 *Power of Attorney*.  Each Member appoints the other Member(s), with full power of substitution, as the Member's attorney-in-fact, to act in the Member's name to execute and file (a) all certificates, applications, reports and other instruments necessary to qualify or maintain the Company as a limited liability company in the states and foreign countries where the Company conducts its activities, (b) all instruments that effect or confirm changes or modifications of the Company or its status, including amendments to the Certificate of Organization, and (c) all instruments of transfer necessary to effect the Company's dissolution and termination.  The power of attorney granted by this Section 10.15 is irrevocable, coupled with an interest and will survive the death or other Dissociation of the Member.

10.16 *Drafting*.  This Agreement has been drafted by SJK Partners as counsel for the Company. Each individual Member and their respective counsel have had a full and fair opportunity to negotiate and review the terms and provisions of this Agreement and to contribute to its substance and form. Each Member has been advised that they have the right to obtain an independent attorney to review this Agreement. Each Member has further been advised that SJK Partners has represented and is currently representing Tarek Abousalem in other corporate matters. The Members waive any claim against SJK Partners related to any conflict of interest created thereby.

[*Remainder of page intentionally left blank; signature page follows*]

21

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement of **Just One More Bite Media Group, LLC** effective as of the day and year first above written.


MEMBERS:

*Greg Shockley*   5/26/2020
F97A46E5C93D43B...
_____
Greg Shockley
9 Wellfleet Lane
Glen Mills, PA 19342


*James Shockley*   5/26/2020
9E2E311CC799404...
_____
James Shockley
1350 North Wells St. 116F
Chicago, IL 60610


TAREK HOLDINGS, LLC

*Tarek Abousalem*   5/26/2020
6D5925FCB4F5463...
_____
Tarek Abousalem, Sole Member
65 Orris Avenue
Piscataway, NJ 08854

DocuSign Envelope ID: D5FC1635-1EEE-4C18-8F59-65BD41B58237

## SCHEDULE A

## INITIAL CAPITAL CONTRIBUTIONS, UNITS AND INTERESTS

### Just One More Bite Media Group, LLC

| Name | Capital Contribution | Units | Interest |
|------|---------------------|-------|----------|
| Greg Shockley | $50,000.00 | 340 | 34% |
| James Shockley | $50,000.00 | 330 | 33% |
| Tarek Holdings, LLC | $50,000.00* | 330 | 33% |

\* Contribution to be made in the form of services.

SCHEDULE B

ANTICIPATED ROLES OF MEMBERS

**Tarek Abousalem (Tarek Holdings, LLC)– Co-Founder & CDO (Chief Digital Officer)**
- Attend partner calls and meetings when necessary
- Help other Members in achieving their tasks
- Assist in branding, sales and marketing
- Responsible for implementing technology solutions (including but not limited to website, mobile app, etc) – Tarek has final say on technology & marketing decisions
- Product development and strategic planning
- Assist in opening up new international markets
- Assist in capital raising efforts

**Greg Shockley – Co-Founder & Acting CEO**
- Attend partner calls and meetings when necessary
- Help other Members in achieving their tasks
- Assist in branding, sales and marketing
- Create Culinary Content (Video/Scripts)
- Manage Budgets and all Startup Costs and create status reports
- Conduct daily Strategic planning meetings with the Members to monitor progress on each project.

**James Shockley – Co-Founder & COO**
- Attend partner calls and meetings when necessary
- Help other Members in achieving their tasks
- Assist in branding, sales and marketing
- Assist in post production of video content
- Work on creating internal documents needed for investors
- Build brand and influencer relationships
- Create and execute multiple marketing campaigns